## RELIANCE INSURANCE COMPANY *v.* GEORGE M. REIDER, JR., INSURANCE COMMISSIONER
### (AC 18058)

Lavery, Hennessy and Stoughton, Js.

Argued February 25—officially released June 29, 1999

*William J. Prensky,* assistant attorney general, with whom, on the brief, was *Richard Blumenthal,* attorney general, for the appellant (defendant).

*Ralph G. Elliot,* for the appellee (plaintiff).

*Opinion*

STOUGHTON, J. The defendant, George M. Reider, Jr., insurance commissioner of the state of Connecticut (commissioner), appeals from the trial court's judgment reversing his decision ordering the plaintiff, Reliance Insurance Company (Reliance), to pay a loss under a manufacturer's output insurance policy issued by Reliance to Mariano Brothers, Inc. (Mariano). The commissioner claims that the trial court improperly concluded that (1) the coverages under the policy were severable and (2) Reliance's failure to file timely notice of cancellation with the Interstate Commerce Commission and the state department of transportation did not extend the cancellation date of the entire policy. We agree and reverse the judgment of the trial court.

The facts as set out in the memorandum of findings and recommendation issued by the insurance department hearing officer, on which the commissioner relied, are not in dispute and may be summarized as follows. In August, 1994, Reliance renewed and issued to Mariano, an interstate motor carrier, three insurance policies effective July 27, 1994, to July 27, 1995.[1] One of these policies, the manufacturer's output policy, contained various coverage provisions.[2]

---

[1] These three policies were the manufacturer's output policy, an automobile liability policy and a general liability policy.

[2] The record reveals that the manufacturer's output policy was a commercial, multiperil policy that insured Mariano against a number of different types of risks. These included coverage against warehouse legal liability, which covered damage to certain properties owned by Mariano, and truck cargo liability. Mariano paid a single premium of $42,325 for this coverage.

Mariano financed that policy and the other two policies through a premium financing agreement with A.I. Credit Corporation (finance company). Pursuant to that agreement, the finance company was appointed as Mariano's attorney-in-fact, with authority to cancel the policies for nonpayment of premiums. In the event of nonpayment, the agreement required the finance company to mail notice of its intent to cancel a policy to Mariano, after which Mariano would have ten days to cure the overdue premiums to prevent cancellation of a policy.

On November 2, 1994, the finance company mailed Mariano notice of its intent to cancel all three insurance policies because of Mariano's failure to pay premiums. A notice of cancellation was subsequently mailed to Mariano and Reliance on November 16, 1994, with an effective date of November 17, 1994, unless the unpaid premiums were paid in full on or before that date. Mariano did not pay the overdue premiums, and the policies were canceled on November 17, 1994.

On January 3, 1995, the finance company directed Reliance to reinstate all three of the policies previously canceled because Mariano had then paid the overdue premiums. Reliance refused to reinstate the manufacturer's output policy. Reliance notified Mariano's insurance broker on January 12, 1995, that that policy remained canceled as of November 17, 1994, and that coverage would not be reinstated until Reliance received deductible reimbursements from Mariano.[3] Reliance indicated that once the reimbursements were received, a thirty day binder would be issued to allow the broker time to obtain other insurance for Mariano.

---

[3] The commissioner's orders of November 7, 1996, and February 21, 1997, directed Reliance to stop its illegal practice of canceling policies for nonpayment of deductible reimbursements. The commissioner determined that such a practice was illegal because it was based on the occurrence of an event not specified by General Statutes § 38a-324.

After Mariano paid the outstanding deductible amounts to Reliance, Reliance issued the thirty day binder, which provided coverage under the manufacturer's output policy through February 26, 1995. That coverage was then extended to March 12, 1995. On March 31, 1995, the finance company issued to Mariano and Reliance another notice of cancellation for all three policies for nonpayment of premiums.

On April 4, 1995, Mariano's warehouse sustained damage from a windstorm. On April 11, 1995, the finance company requested that Reliance reinstate the policies because the finance company had received the delinquent premiums from Mariano. On that same date, Reliance notified the Interstate Commerce Commission and the state department of transportation of its cancellation of the motor carrier portion of Mariano's manufacturer's output policy. On April 21, 1995, the Interstate Commerce Commission notified Mariano that effective May 13, 1995, Mariano's certificate of insurance for cargo coverage would be canceled. Reliance informed the finance company in a letter dated May 9, 1995, that the manufacturer's output policy had not been reinstated.

Reliance ultimately denied coverage for Mariano's claim regarding the windstorm damage to his warehouse. On May 17, 1995, Mariano filed a letter of complaint with the state department of insurance. Following an investigation, the commissioner issued a cease and desist order against Reliance on November 7, 1996.[4] Reliance then requested a hearing pursuant to General Statutes § 38a-19, which was held on January 22, 1997. The department hearing officer issued a decision on

---

[4] The November 7, 1996 cease and desist order directed Reliance (1) to discontinue the illegal practice of canceling policies for nonpayment of deductible reimbursements, (2) to reinstate the manufacturer's output policy and (3) to pay the losses that Mariano incurred on April 4, 1995.

February 20, 1997, concluding that the finance company's November 16, 1994 notice of cancellation failed to effect cancellation because timely notice had not been sent to the Interstate Commerce Commission, as required by 49 C.F.R. 1043.7 (d)[5] and General Statutes § 38a-170 (a) and (d).[6] It is undisputed that Reliance did not notify either the state department of transportation or the Interstate Commerce Commission of the cancellation until April 11, 1995.

In an order issued February 21, 1997, the commissioner adopted the hearing officer's findings and recommendations, modified his November 7, 1996 order and directed Reliance to "honor all of its contractual obligations under [the manufacturer's output policy] through May 13, 1995, due to Reliance's failure to strictly comply

---

[5] At the time of the trial court's decision, this section was recodified to 49 C.F.R. 387.313 (d), which provides in relevant part: "Cancellation notice. Except as provided in paragraph (e) of this section . . . certificates of insurance . . . or agreements shall not be canceled or withdrawn until 30 days after written notice has been submitted to the [Interstate Commerce] Commission at its offices . . . by the insurance company . . . motor carrier, broker, or other party thereto . . . which period of thirty (30) days shall commence to run from the date such notice . . . is actually received by the Commission."

[6] General Statutes § 38a-170 provides in relevant part: "(a) When an insurance premium finance agreement contains a power of attorney enabling the insurance premium finance company to cancel any insurance contract or contracts listed in the agreement on account of any default on the part of the insured, the insurance contract or contracts shall not be cancelled by the insurance premium finance company unless such cancellation is effectuated in accordance with the provisions of this section.

\* \* \*

"(d) All statutory, regulatory, and contractual provisions or restrictions providing that the insurance contract may not be cancelled unless notice is given to a governmental agency . . . or other third party shall apply where cancellation is effected under the provisions of this section. The insurer shall give the prescribed notice in behalf of itself or the insured to any such governmental agency . . . or other third party on or before the second business day after the day it receives the notice of cancellation from the insurance premium finance company and shall determine the effective date of cancellation taking into consideration the number of days notice required to complete the cancellation. . . ."

with [General Statutes] § 38a-170 (d)." Reliance appealed from the commissioner's decision to the trial court, and the trial court reversed the commissioner's decision. This appeal followed.

As a threshold matter, it is well established that "[t]he standard of review in appeals from the decisions of administrative agencies is clearly delineated. Judicial review of [an administrative agency's] action is . . . very restricted. . . . With regard to questions of fact, it is neither the function of the trial court nor of this court to retry the case or to substitute its judgment for that of the administrative agency. . . . Judicial review of the conclusions of law reached administratively is also limited. The court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . Although the interpretation of statutes is ultimately a question of law . . . it is the well established practice of this court to accord great deference to the construction given [a] statute by the agency charged with its enforcement. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts." (Citations omitted; internal quotation marks omitted.) *State Board of Labor Relations* v. *Freedom of Information Commission*, 244 Conn. 487, 493–94, 709 A.2d 1129 (1998). With this standard in mind, we now address the commissioner's claims.

I

The commissioner first claims that the trial court improperly concluded that the warehouse liability portion of the manufacturer's output policy was severable from the truck cargo provisions of that policy with the result that the insurer's failure to give notice to the

Interstate Commerce Commission, as required under federal law with regard to the cancellation of truck cargo liability coverage, saved only the truck cargo provisions of that policy from cancellation. The commissioner contends that the trial court improperly reversed the decision of the commissioner by concluding that the manufacturer's output policy coverages were severable when, in fact, the manufacturer's output policy was not severable as a matter of law. We agree.

When interpreting a statute, courts "should accord a statutory enactment its plain meaning. . . . Moreover, the meaning of statutory language must be determined from a reading of the statute as a whole." (Citations omitted.) *State* v. *Jimenez*, 228 Conn. 335, 341, 636 A.2d 782 (1994). We may not, by construction, "read a provision into legislation that is not clearly stated therein." *State* v. *Fiasconardo*, 25 Conn. App. 643, 645, 595 A.2d 945 (1991).

Our review of the record persuades us that the manufacturer's output policy was not severable. First, it was entitled "Renewal Policy," which by definition suggests a single contract. Second, Mariano paid *one* annual premium for the manufacturer's output policy. Third, there was no allocation of the annual premium between the various coverages under the manufacturer's output policy. Fourth, the premium finance agreement between Mariano and the finance company lists the manufacturer's output policy as a single policy, separate from the automobile and general liability policies. Fifth, the finance company's March 31, 1995 notice of cancellation purportedly canceled the manufacturer's output policy as a whole, not a particular coverage provision within that policy.

The statutory language of § 38a-170 clearly refers to the cancellation of an "insurance contract or contracts," not specific coverage provisions within those contracts.

According the statute its plain meaning, we thus conclude that the finance company could and purported to cancel the entire manufacturer's output policy, and not just the warehouse liability provision within that policy. We further conclude that the finance company's cancellation of the manufacturer's output policy could not become effective until Reliance notified the state department of transportation and the Interstate Commerce Commission as required by § 38a-170 (d), because the manufacturer's output policy contained a nonseverable truck cargo liability provision.[7]

Our review of the record reveals that on February 21, 1997, the commissioner modified his November 7, 1996 cease and desist order by directing Reliance to "honor all of its contractual obligations under [the manufacturer's output policy] through May 13, 1995 . . . ." On the basis of the undisputed facts in the record, we conclude that the commissioner acted reasonably and legally and did not abuse his discretion in ordering Reliance to honor its contractual obligations under the manufacturer's output policy through May 13, 1995. The trial court, therefore, improperly reversed the decision of the commissioner on this ground.

II

The commissioner's final claim is that the trial court improperly concluded that Reliance's failure to file a timely notice of cancellation with the Interstate Commerce Commission and the state department of transportation pursuant to General Statutes § 38a-170 (d) did not extend the cancellation date of the entire manufacturer's output policy. We agree.

To effect cancellation of the manufacturer's output policy, Reliance first had to give notice to the Interstate

[7] The department of transportation and the Interstate Commerce Commission are authorized to regulate motor contract carriers pursuant to General Statutes §§ 13b-410 and 13b-410a, respectively.

Commerce Commission and the state department of transportation pursuant to § 38a-170.[8] Pursuant to § 38a-170 (d), Reliance was required to provide notice to those regulatory agencies "on or before the second business day after the day [the insurer] receives the notice of cancellation from the insurance premium finance company . . . ." Additionally, as we discussed in part I of this opinion, § 38a-170 (a) provides that insurance contracts listed in a premium finance agreement that grants a power of attorney to the finance company "*shall* not be canceled" by the finance company "unless such cancellation is effectuated in accordance with the provisions of this section." (Emphasis added.)

Here, the finance company issued notice to Reliance and Mariano on March 31, 1995, that the manufacturer's output policy was canceled. Reliance, however, did not notify the Interstate Commerce Commission or the state department of transportation of the cancellation until April 11, 1995, well after the statutory mandate of § 38a-170, i.e., the second business day from the date it received the notice of cancellation from the finance company. Accordingly, Mariano's April 4, 1995 loss was covered under the manufacturer's output policy because the cancellation was not effective without the appropriate notice mandated by § 38a-170.

The judgment is reversed and the case is remanded with direction to render judgement dismissing the plaintiff's appeal.

In this opinion the other judges concurred.

---

[8] See footnote 6.